No. 67,881

STATE OF KANSAS, *Appellee*, v. JAMES CROMWELL, *Appellant.*

(856 P.2d 1299)

Opinion filed July 30, 1993.

*Rebecca E. Woodman,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Debra S. Byrd,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Defendant James Cromwell appeals his jury conviction and his sentence for two counts of premeditated first-degree

murder, two counts of aggravated robbery, two counts of rape, one count of aggravated criminal sodomy, and one count of theft.

Defendant contends: (1) he was deprived of his constitutional right to effective assistance of counsel or, in the alternative, the right to conduct his own defense; (2) he was denied his right to be present during trial; (3) the court erred in allowing the jury to consider evidence about the 1987 crimes to prove his identity with respect to the 1991 crimes; (4) the court abused its discretion in denying defendant's motion to sever; and (5) the court erred in accepting the jury's recommendation of a mandatory 40-year sentence. We determine that no reversible error of law appears and affirm.

The charges against defendant arise out of the deaths of two women, Ernestine Hoist, age 60, and Isabell Moore, age 85, and the theft of a car. Ms. Hoist's body was discovered in her apartment after she did not show up for work on February 3, 1987. There were no signs of forced entry into her apartment, but there was evidence of a struggle. Ms. Hoist's billfold and checkbook were missing. She died as a result of ligature and manual strangulation. The police chemist detected seminal material in a vaginal swab taken from Ms. Hoist. A population geneticist testified that DNA extracted from seminal material found in the vaginal swab from Ms. Hoist matched the defendant's DNA. The defendant worked with Ms. Hoist at the Salvation Army.

In January 1987, defendant also worked as a painter and laborer for Earl Griffith. On January 31, 1987, Griffith bought defendant some groceries and loaned defendant his yellow 1973 Volkswagen so that defendant could take the groceries home. Defendant never returned the car, and he admitted he left Wichita in a yellow 1973 Volkswagen sometime in February 1987.

Defendant returned to Wichita in 1990 and again worked and lived at the Salvation Army. In February 1991, he was asked to leave the Salvation Army because of his drinking. On or about Friday, February 22, 1991, defendant went to stay with a friend, Don Griffin, who had an apartment directly below Isabell Moore's apartment. Isabell Moore helped the apartment owners by collecting rent and letting repair people into the apartments. Griffin introduced defendant to Ms. Moore; defendant subsequently went to Ms. Moore's apartment on several occasions with Griffin or

alone to use the telephone or to ask for money or food. Griffin
and another witness testified that defendant left Griffin's apart-
ment early in the evening on Monday, February 25, 1991, and
that he did not return until about 1:30 or 2:00 a.m., Wednesday,
February 27. They also testified that between 9:00 and 10:00
p.m. on February 25 or 26, they heard a lot of noise in Ms.
Moore's apartment.

After unsuccessful attempts to contact Isabell Moore on Feb-
ruary 26 and the morning of February 27, 1991, the owner of
Ms. Moore's apartment building discovered her body in her apart-
ment. There were no signs of forced entry into the apartment,
but there was evidence of a struggle. Ms. Moore's purse was
missing. She died as the result of manual and ligature strangu-
lation, but she also had numerous bruises and abrasions on her
body and a postmortem stab wound in her upper left chest. The
presence of undigested food in her stomach, together with her
habit of eating at 6:00 p.m., suggested that Ms. Moore died
between 9:00 and 10:00 p.m. There was evidence of vaginal and
anal penetration, and evidence of seminal material in the vaginal
swabs and pubic hair from Ms. Moore's body. The police chemist
testified that a hair found at the scene was "consistent with"
defendant's hair and could have come from defendant. There was
not sufficient DNA material on the vaginal swabs to complete a
DNA analysis.

Defendant was charged with two counts of first-degree murder,
two counts of aggravated robbery, two counts of rape, one count
of aggravated criminal sodomy, and one count of felony theft.
The court denied defendant's motion to sever the charges arising
out of the Hoist homicide from those arising out of the Moore
homicide. The jury found defendant guilty of all counts and found
that aggravating factors existed in the death of Ms. Moore to
warrant imposition of the mandatory 40-year sentence. See K.S.A.
1992 Supp. 21-4624; K.S.A. 1992 Supp. 21-4625; K.S.A. 1992
Supp. 21-4628.

The court entered judgment against the defendant on all counts
and found there was sufficient evidence to support the jury's
recommendation of the mandatory 40-year sentence. The court
sentenced the defendant to life pursuant to K.S.A. 21-4501(a) for
the premeditated murder of Ernestine Hoist; to terms of 15 years

to life for each of the counts of rape, aggravated robbery, and aggravated criminal sodomy pursuant to 21-4501(b); to a term of one to five years for the theft count pursuant to 21-4501(e), and to a term of life without parole for 40 years pursuant to 21-4501(a) and K.S.A. 1992 Supp. 21-4628 for the premeditated murder of Isabell Moore.

## EFFECTIVE ASSISTANCE OF COUNSEL

Defendant made known his dissatisfaction with appointed counsel early in the proceedings. The information was filed in June 1991, and defendant was represented by counsel at the preliminary hearing in July. In August, defendant wrote twice to the ACLU, expressing dissatisfaction with his attorney. In October, he expressed his written dissatisfaction to the Wichita Bar Association, the Office of the Disciplinary Administrator, and Judge Cranmer, who had presided over the preliminary hearing.

At the pretrial hearing on November 15, 1991, Judge Owens asked defendant if he had any more complaints other than those identified in the letter to Judge Cranmer. Defendant expressed additional specific complaints. Although defense counsel explained the circumstances surrounding many of defendant's specific complaints, it was clear that a serious communication problem existed. Defendant repeatedly expressed his distrust of his attorney and had refused to see her on several occasions immediately before trial. He asked the court to appoint substitute counsel. Defense counsel stated that she wanted to represent defendant and that she was prepared for trial.

The Sixth Amendment right to counsel includes the right to effective assistance of counsel and the right to conduct one's own defense. See *Faretta v. California,* 422 U.S. 806, 819, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975) (self-representation); *Powell v. Alabama,* 287 U.S. 45, 71, 77 L. Ed. 158, 53 S. Ct. 55 (1932) (effective assistance); *State v. Cunningham,* 222 Kan. 704, 706, 567 P.2d 879 (1977) (self-representation). An indigent criminal defendant is not entitled to counsel of his or her own choice. *State v. Banks,* 216 Kan. 390, 393, 532 P.2d 1058 (1975). Generally, the decision whether to appoint new counsel is a matter left to the trial court's discretion. *Banks,* 216 Kan. 390, Syl. ¶ 2; *State v. Saeger,* 13 Kan. App. 2d 723, Syl. ¶ 1, 779 P.2d 37

(1989). Irreconcilable conflict between a defendant and his attorney may, under certain circumstances, require the appointment of substitute counsel in order to protect a defendant's Sixth Amendment right to effective assistance of counsel. See, e.g., *Smith v. Lockhart,* 923 F.2d 1314, 1320 (8th Cir. 1991); *United States v. Williams,* 594 F.2d 1258, 1260 (9th Cir. 1979); *Brown v. Craven,* 424 F.2d 1166, 1170 (9th Cir. 1970).

The complete breakdown of communication between an attorney and his or her client may evidence an irreconcilable conflict that requires appointment of substitute counsel. In the instant case, the communication problem was presented to the court a few days before trial was scheduled to begin. The trial court denied defendant's motion for substitute counsel, but took steps to reestablish the communication between attorney and client and allowed additional time for trial preparation.

After pretrial motions were argued, defendant asked to serve as "cocounsel" in his own defense. He expressed concern that he had not had time to discuss several State's witnesses with his attorney and thought that he might be better able to cross-examine those witnesses. He made it clear that he did not wish to represent himself, but wished to assist his counsel. The court took his request under advisement. Expressing concern about the communication problems between defendant and his counsel, the court asked defendant if he needed more time to prepare for trial. Defendant indicated that if the court granted a continuance, he would use that time to communicate with his attorney to prepare for trial. The court granted a three-week continuance.

"THE COURT: [The court] can if you feel as though you need that time to become prepared. Your attorney has indicated she is ready to go; but if you feel as though you need more time to begin your communication, begin with her and work with her so that she can find out more information from you and you can find out information from her of more recent developments, the Court would consider granting you a continuance in the case starting on Monday, perhaps setting it over for two or three weeks, if that's what you want. I just don't want to rush you into trial, if there's been any communication problems that can possibly be solved by granting a continuance in this case.

"THE DEFENDANT: I would appreciate it.

"THE COURT: So it is your desire the case be continued for perhaps two or three weeks so that you can have this communication with Ms. Bacon?

"THE DEFENDANT: Yes, sir."

The court granted a three-week continuance and told defendant:

"THE COURT: Yes. Well, I am going to honor your request, Mr. Cromwell; and I will continue the case and set it over for trial for December 9th. And what I will ask for you to do then between now and then, is to do everything you can to communicate with Ms. Bacon."

On December 5, 1991, another pretrial hearing took place and the court ruled on various pretrial motions and held a *Jackson v. Denno* hearing. While there were indications of continuing problems in the relationship between defense counsel and defendant, there also was some indication that they were communicating.

The content of defense counsel's cross-examination of one of the detectives who interviewed defendant strongly suggested that defense counsel and defendant had conferred about what took place during the interview. She inquired about the lapse of several hours between the time the detective *Mirandized* defendant and the time the taped interview began. She asked if the detective told defendant "over and over again" that he did not do very well on the polygraph. She asked, "[D]idn't you tell Mr. Cromwell that what you really wanted was a statement that you could play to Mr. Griffin, who was the other suspect?" She asked, "Did you not tell Mr. Cromwell at that time that what you needed on your case for Mr. Griffin was a statement by him, meaning Mr. Cromwell, of Mr. Griffin's involvement, so that you could play it to him while he was in prison? . . . And indeed didn't you spend some time talking to him, explaining to him what exactly should be on this statement?".

Defendant and his counsel also communicated at the hearing. At the close of her cross-examination of one witness, defense counsel told the court that defendant had asked if he could cross-examine the witness. The court indicated it preferred that defense counsel conduct the examination, and defendant and his counsel conferred privately before defense counsel asked some additional questions. Defendant also testified at the hearing and conferred with his counsel after his testimony, before the defense rested.

Trial commenced on December 9, 1991, as scheduled. After voir dire, defense counsel made a record that she had advised

defendant not to put his NCIC records into evidence but that defendant chose to do so. In order to facilitate defendant's wishes, she had entered into a stipulation that "would allow for someone available to testify to it." She also advised the court that defendant had asked her to make a clear record that he preferred and believed it was his right that Detective Holmes not be present in the courtroom when other witnesses testify.

Although the court ultimately denied defendant's request to present the opening statement, defense counsel advocated defendant's position on this request. The record reflects defendant's communication with his counsel about the opening remarks. Defense counsel indicated that defendant had expressed a desire to give the opening statement, that she had discussed with him the court's discretion regarding that request, and had advised him about protocol if the court granted the request. Defendant and his counsel had conferred privately after the court indicated its understanding that defendant wanted legal representation and told defendant the extent to which he could participate in the proceedings was discretionary. Defense counsel told the court that defendant's plan for his opening statement was succinct and not objectionable.

Defense counsel conferred privately with defendant after cross-examining the first State's witness and before telling the court she had no further questions. After the second witness' direct testimony, defense counsel told the court that defendant wanted to conduct the cross-examination. Defendant said there were three questions he wanted to ask: "The way I want to phrase them, I don't know if Mrs. Bacon would say them the way I would say it but then is within the bounds of the law, the way I can ask the questions." The court denied defendant's request and suggested that defendant "continue to confer with your counsel, and you can allow your counsel then to ask those questions of the witness." Defendant and his counsel conferred privately, and counsel cross-examined the witness. After cross-examining the third State's witness, defense counsel again conferred privately with defendant before indicating that she had no further questions.

The court recessed for the afternoon break. Before the jury was brought back in, defense counsel indicated that defendant

had an oral motion he wished to make. Defendant then asked if he could be his own counsel, "[i]f that's the only way I can question witnesses." After some discussion between the court and the defendant, the court, referring to defendant's earlier explanation as to why he wanted to cross-examine a witness, said:

"What I had in mind is that the possibility might exist you and your attorney would disagree strategically on the types of questions that need to be asked; and your attorney might choose not to go into a certain area that you wished to go into; but if we are talking about the same questions, then I don't see any difference between you asking those questions and your attorney asking those questions."

The defendant replied:

"Well, there seems to be a difference. The witness that just left, I wanted to question, specific question. The man stated that he was the foreman at the place where I had been at, all right. From what I gathered, it was established that I was still at that place in February of 1987. I have the records to prove that's a lie. I'm not able to bring that forward. I'm not able to show that. So then, thereafter, I need to be my own attorney."

Although defendant's statement relates to whether the court properly denied his request to act as cocounsel, his statement merits comment. Defendant suggested that there was additional information he wanted to add by his questions that was not brought out by his counsel. This is not the case. First, he did not ask the court for permission to cross-examine the witness. Second, defense counsel conferred with defendant after she cross-examined the witness and before indicating she had no more questions. Third, defense counsel established on cross-examination that the witness did not know when defendant left the Salvation Army and that the witness could *not* testify that defendant was living there in 1987. Thus, defendant's perception about what the testimony established is incorrect.

The court advised defendant he needed to work through the assistance of his counsel and denied his request for self-representation. Defendant then asked to leave the courtroom and expressed his desire not to be present during the trial.

Communication continued after defendant left the trial. The first thing in the morning on December 10, defense counsel renewed defendant's motion to represent himself because it was important to her client. Defendant declined the opportunity to

add to his counsel's argument. When the court denied the motion and asked defendant if he wanted to be in or out of court, defense counsel indicated that defendant would like to stay if the court would allow him to cross-examine some witnesses when he felt his counsel was not doing a good job.

Defendant told the court that the reason he wanted to cross-examine witnesses was because he did not trust his attorney to ask the questions that he would ask. The court informed the defendant that if his attorney would not ask questions he thought were important, that might be reason enough for him to be allowed to ask the questions but that complaints about the form of the question were not sufficient. Defense counsel indicated that for strategic reasons she had modified some of the questions he requested, and defendant chose to leave the courtroom.

Communication between attorney and client continued even after this incident. On the morning of December 13, the court advised defendant of his right to testify (or not to testify) and that if he chose to testify, the State could cross-examine him. The following colloquy took place:

"THE COURT: . . . At this time would you like to have more time to discuss with your attorney the decision as to whether or not you wish to testify in this proceeding?

"THE DEFENDANT: No, Your Honor. We have discussed it."

Defendant stated he did not want to testify and asked to be excused. Defendant was present at sentencing and given the opportunity to speak to the court.

Although there was a substantial break in communication between defendant and his counsel, which, if not addressed, might have resulted in an irreconcilable conflict, the court restored communication between defense counsel and client, making it unnecessary to appoint substitute counsel. The defendant and his counsel took advantage of the three-week continuance to communicate with one another, and communication continued throughout all proceedings. Under these circumstances, we conclude that the trial court did not abuse its discretion in refusing to appoint substitute counsel.

## SELF-REPRESENTATION

As noted above, after the State's third witness testified, de-

fendant asked the court to allow him to represent himself. This was the first time defendant had made such a request. Defendant claims on appeal that the trial court erred by not allowing him to represent himself.

Although a defendant has a right to self-representation, that right is unqualified only if it is asserted before trial. *United States v. Mayes*, 917 F.2d 457, 462 (10th Cir. 1990), *cert. denied* 112 L. Ed. 2d 1192 (1991). If a defendant does not ask to represent himself before trial starts, the court has discretion whether to grant his request for self-representation. 917 F.2d at 462.

Defendant attempts to avoid this timeliness requirement by claiming that the court did not inform him of his right to self-representation. However, defendant considered and rejected the possibility of self-representation as early as the pretrial conference on November 15, 1991. In discussing his desire to act as co-counsel, defendant stated he was not asking to act as counsel, but only as cocounsel. Defendant repeatedly stated that he did not want to be lead counsel and stated that he did not want to say which witnesses would be called, did not want to make the opening statement or closing argument, and did not want to make legal arguments. At the final pretrial conference on December 5, 1991, the court specifically advised defendant that he had a constitutional right to represent himself. At the close of that hearing, the court, defense counsel, and defendant specifically discussed whether defendant wanted to represent himself. Defendant said he did not.

Because defendant did not ask to represent himself until after trial was under way, it was within the trial court's discretion to grant or deny defendant's request. In exercising that discretion, a court should balance the alleged prejudice to defendant with " 'disruption of the proceedings, inconvenience and delay, and possible confusion of the jury,' " and should also consider the reason for the request and the quality of counsel's representation. *Mayes*, 917 F.2d at 462.

Our consideration of the record leads us to conclude that the court, in balancing the above factors, did not abuse its discretion in denying defendant's motion for self-representation. Allowing self-representation after a day of trial with counsel and after three

witnesses had testified could have been disruptive, and could well have confused the jury.

Next, the reason for defendant's request does not support his claim that the trial court abused its discretion. Defendant asked to represent himself because the court did not allow him to cross-examine a witness. A defendant has no constitutionally protected right to serve as cocounsel. *State v. McKessor,* 246 Kan. 1, 12, 785 P.2d 1332, *cert. denied* 495 U.S. 937 (1990). The trial court nevertheless established a procedure by which defendant could ask to cross-examine witnesses during the trial. The court denied defendant's first such request because the only reason defendant gave was that he believed he might ask the questions differently than his counsel would ask them. Dissatisfied with the court's denial of his request, defendant asked to represent himself after the third witness had testified.

Finally, the quality of defense counsel's representation does not lead us to conclude that the court abused its discretion in denying defendant's request for self-representation. Although defendant essentially claims that defense counsel did not provide any defense at all after he left the courtroom, the record reflects her continuing advocacy of both his expressed wishes and his best interest. She renewed defendant's motion for self-representation at his request, cross-examined several key witnesses, and objected to much of the State's evidence. She moved for judgment of acquittal or new trial and objected to jury instructions. She argued for leniency in sentencing.

One of the reasons advanced by the court for the need of defendant to be represented by counsel was the anticipated presence of expert testimony of DNA experts and counsel's expertise in conducting a cross-examination in this area. Defendant correctly points out that defense counsel did not cross-examine the witness who offered DNA testimony. Defendant is correct that DNA evidence was particularly significant evidence in the conviction for the murder of Hoist. Defendant argues that defense counsel's failure to cross-examine the DNA expert, particularly in light of her opening statements emphasizing the importance of cross-examination, was evidence that he did not have effective assistance of counsel.

Although defense counsel did not cross-examine the DNA expert at trial, she did cross-examine the expert at the preliminary hearing. Defense counsel's cross-examination at the preliminary hearing did little to undermine the value of the DNA evidence. In light of this cross-examination, cross-examination at trial might have accomplished nothing more than confirming direct examination. Defense counsel hired and consulted with a DNA expert. It may well be concluded that her decision to forego cross-examination of the DNA expert was a sound tactical decision.

The right to effective assistance of counsel is a cornerstone of our system of justice. In order to preserve that right, it is essential that courts attend to objective, legitimate complaints that indigent defendants present about their attorneys. The trial court here attended to defendant's complaints and went to great lengths to protect defendant's right to effective assistance of counsel. Defendant was not denied his right to effective assistance of counsel.

## RIGHT TO BE PRESENT AT TRIAL

As noted above, after the court denied the defendant's request to represent himself, defendant asked to be excused from the trial. The court advised him of the possible adverse impact of his absence and assured defendant that he was welcome to remain in the courtroom. Defendant chose to leave.

On appeal, defendant properly notes that an accused has a constitutional right to be present at every stage of trial. *Illinois v. Allen*, 397 U.S. 337, 338, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970). A defendant can waive that right, however, and defendant's voluntary absence may be deemed a waiver of the right to be present. *State v. Kelly*, 213 Kan. 237, 241, 515 P.2d 1030 (1979); *State v. Galloway*, 16 Kan. App. 2d 54, 56, 817 P.2d 1124, *rev. denied* 249 Kan. 777 (1991). A defendant's "voluntary absence after the trial has been commenced in such person's presence shall not prevent continuing the trial to and including the return of the verdict." K.S.A. 22-3405. A defendant cannot impede a trial by choosing to be absent. *Galloway*, 16 Kan. App. 2d at 56.

Defendant claims that his absence was not voluntary because his poor relationship with his attorney, together with the trial court's denial of his request to be cocounsel and denial of his

request to represent himself, conveyed to him that he was not welcome at the trial and could not be a part of it. This court has rejected similar arguments in the past. In *State v. Salton,* 238 Kan. 835, 715 P.2d 412 (1986), the court denied defendant's pretrial request for new counsel when defendant said he was not ready for trial and would not attend. On appeal, he claimed his absence was not voluntary. We said that if the trial court erred at all, defendant invited the error. 238 Kan. at 837-38. In *Salton,* we concluded that the defendant's absence was "clearly voluntary." 238 Kan. at 838.

The trial court listened to and took steps to resolve problems between defendant and his attorney. Communication was restored. The trial court set up a proper procedure to deal with defendant's specific requests to cross-examine witnesses. The court did not abuse its discretion in denying defendant's request to represent himself.

Defendant chose to leave the trial. The court advised defendant of the risks associated with his absence and assured defendant he was welcome to stay. The court brought defendant into the courtroom every day to ask him if he wanted to be present. The court left a standing order at the jail to return defendant to the court immediately if he expressed any desire to return to the court. Before the trial ended, defendant was given the opportunity to testify; he declined after having discussed his right with his attorney and again expressed his desire to leave the courtroom. He was present at sentencing.

Defendant's absence from the trial was voluntary; he waived his constitutional right to be present. The trial court did not err in allowing the trial to continue.

### USE OF EVIDENCE ABOUT ONE RAPE/ROBBERY/ MURDER TO PROVE IDENTITY IN THE OTHER RAPE/ROBBERY/MURDER

Before trial, the State moved that evidence of the crimes against Ms. Hoist be admitted and that the jury be allowed to consider it in reaching a verdict about the crimes against Ms. Moore and "vice versa." The State argued that such evidence was admissible under K.S.A. 60-455 because it was relevant to prove identity, intent, preparation, plan, and motive. The court initially deferred

ruling on the motion, properly noting that because it had denied defendant's motion to sever the charges, the evidence would be *admissible* at trial, leaving only the issue of the purposes for which the jury could consider it. The jury instructions would address the purposes for which the jury could consider the evidence.

The court ultimately granted the State's motion, but only to the extent it allowed the jury to use the evidence for purposes of proving identity. Instruction No. 17 instructed the jury to "decide each charge separately on the evidence and law applicable to it." It also instructed that the jury could consider evidence tending to prove the defendant committed the crimes charged in the Hoist case, in the Isabell Moore case and vice versa, but "solely for the purpose of proving the defendant's identity."

Defendant claims that the trial court erred in allowing evidence of earlier crimes to be used for even the limited purpose of proving identity in the later crimes. He claims that 60-455 does not apply to this case because it applies only to prior convictions. He also claims that the instruction was "enormously prejudicial" because identity was the only real issue in the Moore case, where the State did not have the DNA evidence to specifically link defendant to the crime. Defendant claims the instruction basically told the jury to "ignore evidence in one incident if it found enough evidence in the other, even if in reality the State had not sustained its burden of proving the charges in that one incident beyond a reasonable doubt."

The admissibility of the evidence under K.S.A. 60-455 is not an issue in this case. Because the cases were tried together, the questioned evidence was admissible independent of 60-455. The only issue is whether the court erred in instructing the jury that it could consider evidence that defendant committed one set of crimes to prove identity in the other set of crimes. In general, when evidence is admissible independent of 60-455, a limiting instruction is not required. See, *e.g., State v. Wilson*, 247 Kan. 87, 97, 795 P.2d 336 (1990). Accordingly, the limiting portion of Instruction No. 17 was unnecessary, and the instruction given was not error.

Instruction No. 17 advised the jury that it could consider the evidence on the issue of identity. As the cases involving 60-455

instruct, evidence that a defendant had committed similar offenses may be relevant to the issue of identity. See, *e.g.*, *State v. Williams*, 234 Kan. 233, 234, 670 P.2d 1348 (1983); *State v. Lomax & Williams*, 227 Kan. 651, 653, 608 P.2d 959 (1980); *State v. Henson*, 221 Kan. 635, 644, 562 P.2d 51 (1977); *State v. Johnson*, 210 Kan. 288, Syl. ¶ 4, 502 P.2d 802 (1972). The crimes here were strikingly similar.

Defendant also claims that the instruction basically told the jury to ignore the burden of proof and that it could convict defendant of one crime if it found enough evidence that he committed the other. On the contrary, Instruction No. 17 specifically told the jury to consider each crime separately and to decide each charge "separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge." Instruction No. 17 permitted the jury to consider evidence that defendant committed one of the homicides in considering the other homicide, "solely for the purpose of proving the defendant's identity." In addition, Instruction No. 14 properly instructed the jury on the State's burden of proof. The jury is presumed to follow the instructions as a whole. *State v. Logan*, 236 Kan. 79, 84, 689 P.2d 778 (1984).

The evidence was admissible because the charges were tried together. Because the evidence was admissible independent of 60-455, a limiting instruction was not necessary. The trial court nevertheless gave a limiting instruction that limited the purposes for which the jury was to consider the evidence and placed the burden of proof for each separate crime upon the State. The instruction was not erroneous.

### SEVERANCE

Before trial, defendant moved to sever the charges so that the Hoist and Moore incidents could be tried separately. The trial court denied the motion because the charges were "of the same or similar character." See K.S.A. 22-3202(1). Defendant claims that the trial court abused its discretion in allowing the Moore and Hoist incidents to be tried together because they were not sufficiently similar and because the potential for prejudice was too great where the jury heard evidence of both crimes.

K.S.A. 22-3202(1) provides in pertinent part:

"Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character . . . ."

Whether a defendant will be tried on all separate charges in a single trial is a matter within the discretion of the trial court, and its decision will not be disturbed on appeal unless there is a clear showing of abuse of discretion. *State v. Woods*, 250 Kan. 109, 116, 825 P.2d 514, *cert. denied* 121 L. Ed. 2d 100 (1992); *State v. Adams*, 218 Kan. 495, 506, 545 P.2d 1134 (1976). If reasonable people could differ about the propriety of the trial court's decision, this court will not find that the trial court abused its discretion. *Woods*, 250 Kan. at 117.

Defendant claims that the difference in ages of the victims, the lapse of four years between the crimes, and the application of the "hard 40" sentence to one, but not the other, renders the events sufficiently dissimilar to require that they be tried separately. The State argues, and we agree, that the differences are not material and that the similarities far outweigh the differences.

Although the victims were different ages, they both were mature women who lived alone and knew the defendant. The lapse of four years does not make the crimes dissimilar. There was evidence that the defendant was out of the state between 1987 and mid-1990. The application of the "hard 40" sentence to the Moore crime but not to the Hoist crime is not material. The legislature did not consider differences in sentences to be dispositive because K.S.A. 22-3202(1) speaks of the similarities of the crimes, not the sentences, and contemplates potential trial of felonies and misdemeanors together. Moreover, while the consideration of aggravating factors may distinguish the hard 40 from other sentences, the jury considers whether to impose the hard 40 in a separate proceeding after the guilt phase of the trial is complete. Thus, evidence of and argument about aggravating factors need not taint the guilt phase of the trial.

Defendant's claim that the jury was encouraged to infer guilt in one incident based on guilt in the other is not supported in the record. The trial court instructed the jury to consider separately the evidence and law applicable to each crime and to limit the purposes for which the jury might consider evidence of

one incident in reaching a verdict in the other. Even if tried separately, the similarity of the crimes would make the evidence of one admissible under K.S.A. 60-455 to prove identity in the other. See *Williams,* 234 Kan. at 234; *Lomax & Williams,* 227 Kan. at 653; *Henson,* 221 Kan. at 644-45; *State v. Johnson,* 210 Kan. at 292-93. We have declined to find error when a trial court refused to sever charges that were sufficiently similar such that evidence of one would be admissible under 60-455 in the trial of the other and no prejudice would result to the defendant. See, *e.g., State v. Breazeale,* 238 Kan. 714, 729-30, 714 P.2d 1356, *cert. denied* 479 U.S. 846 (1986); *State v. Howell,* 223 Kan. 282, 285-86, 573 P.2d 1003 (1977). The trial court did not err in denying defendant's motion to sever the Hoist and Moore charges.

## HARD 40

Defendant finally contends that there was not sufficient evidence to support the court's decision to accept the jury's recommendation of a mandatory 40-year sentence. K.S.A. 1992 Supp. 21-4624 permits the imposition of a mandatory 40-year sentence when the jury finds evidence of certain aggravating factors and the court finds that the jury's recommendation was supported by the evidence. The trial court instructed the jury that it could recommend the hard 40 if it found one of three aggravating factors:

1.  Defendant committed the crime for defendant's own self for the purpose of receiving money or any other thing of monetary value;
2.  Defendant committed the crime in order to avoid or prevent lawful arrest or prosecution;
3.  Defendant committed the crime in an especially heinous, atrocious, or cruel manner.

The jury found all three factors. See K.S.A. 1992 Supp. 21-4625(3), (5), and (6).

Defendant claims on appeal that it is not proper to impose the hard 40 based on the first factor unless receiving monetary value is the sole purpose for the murder. Defendant claims that the second factor does not justify the hard 40 unless the victim was

about to apprehend him. Finally, defendant claims that the third factor is unconstitutionally vague.

Most of the cases on which defendant relies with respect to the first two factors are death penalty cases. See *Ex Parte Johnson*, 399 So. 2d 873 (Ala. 1979); *State v. Bigelow*, 37 Cal. 3d 731, 209 Cal. Rptr. 328, 691 P.2d 994 (1984); *Menendez v. State*, 368 So. 2d 1278 (Fla. 1979). We have held that such cases are of limited precedential value in evaluating the propriety of factors in hard 40 sentence enhancement cases. *State v. Bailey*, 251 Kan. 156, 171, 834 P.2d 342 (1992). Defendant also cites *Boutwell v. State*, 659 P.2d 322, 328 (Okla. 1983), which involved a "murder for remuneration" factor that the court found, by definition, meant murder for hire.

Defendant's argument that allowing the hard 40 sentence in such cases would make most murders subject to the hard 40 does not invalidate such an interpretation of the statute. The legislature has said that it is particularly egregious to take the life of another to obtain property or to avoid being held accountable for a crime. The legislature has allowed courts and juries to impose particularly hard sentences for such conduct. The language of the statute is not expressly limited to cases involving murder for hire or those in which the victim was about to apprehend the defendant. Moreover, this court has implicitly rejected the notion that K.S.A. 1992 Supp. 21-4625(5), applies only in cases where the victim is about to apprehend the defendant. In *Bailey*, 251 Kan. at 173-74, the court affirmed the trial court's acceptance of the hard 40 sentence recommendation based on K.S.A. 1992 Supp. 21-4625(5), where the victim was not about to apprehend the defendant.

There was evidence that defendant committed the murder for the purpose of obtaining money or other items of value. Moore's purse was not found, and Hoist's billfold and checkbook were missing from her apartment. Indeed, defendant was convicted of aggravated robbery in both instances. There also was evidence that defendant committed the murders to avoid arrest or prosecution. Both victims knew defendant and would have been able to identify him as the person who raped and robbed them.

Finally, defendant argues that the third factor, K.S.A. 1992 Supp. 21-4625(6), is unconstitutionally vague. The district court

included the following definitions in its sentencing instructions to the jury: " 'heinous' means extremely wicked or shockingly evil; 'atrocious' means outrageously wicked and vile; 'cruel' means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of the sufferings of others." This court has twice rejected the argument that 21-4625(6) is unconstitutionally vague, and has indicated that such an argument is particularly meritless when definitions identical, or nearly identical, to those used here are included. See *State v. Walker*, 252 Kan. 279, 300-01, 845 P.2d 1 (1993); *Bailey*, 251 Kan. at 173. The trial court did not err in accepting the jury's recommendation.

Affirmed.